UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TIMOTHY A. FINNEGAN,

                              Plaintiff,

      v.

STATE TROOPER LAWRENCE M.
BERBEN, *et al.*,

                              Defendants.

No. 20-CV-10231 (KMK)

OPINION & ORDER

<u>Appearances:</u>

Cary London, Esq.
Shulman & Hill, PLLC
New York, NY
*Counsel for Plaintiff*

Ellie Amanda Silverman, Esq.
Ellie Silverman Law P.C.
New York, NY
*Counsel for Plaintiff*

Caitlin Anne Robin, Esq.
Caitlin Robin & Associates PLLC
New York, NY
*Counsel for Plaintiff*

Kevin Scott Volkommer, Esq.
Gordon Rees Scully Mansukhani, LLP
New York, NY
*Counsel for Plaintiff*

Gee Won Cha, Esq.
Neil Shevlin, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendant Berben*

KENNETH M. KARAS, District Judge:

Timothy Finnegan ("Plaintiff") brings this Action, pursuant to 42 U.S.C. § 1983 ("§ 1983"), against New York State Trooper Lawrence Berben ("Defendant") and New York State Troopers John and Jane Does Numbers 1–10, alleging that he was subjected to an unlawful stop and search, false arrest and false imprisonment, malicious prosecution, and the denial of his right to a fair trial. (*See generally* Compl. (Dkt. No. 5).) Plaintiff also asserts a failure to intervene claim pursuant to § 1983, presumably against the Doe Defendants. (*See id.* ¶¶ 82–85.)[1] Before the Court is Defendant's Motion for Summary Judgment (the "Motion"). (*See* Not. of Mot. (Dkt. No. 83).) For the reasons explained below, Defendant's Motion is granted in part and denied in part.

I.  Background

A.  Factual Background

The following facts are taken from the Parties' statements pursuant to Local Civil Rule 56.1. (*See* Def's Rule 56.1 Statement ("Def's 56.1") (Dkt. No. 85); Pl's Rule 56.1 Statement ("Pl's 56.1") (Dkt. No. 94); Def's Resp. to Pl's Counterstatement of Facts ("Resp. to Pl's Counterstatement") (Dkt. No. 98).)[2] Additionally, where necessary, the Court cites directly to the admissible evidence submitted by the Parties.

---

[1] Unless otherwise noted (as here), the Court cites to the ECF-stamped page number in the upper righthand corner of each page.

[2] Under Local Rule 56.1, motions for summary judgment must be supported by "a separate, short[,] and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried," and, for each paragraph, a "citation to evidence which would be admissible." Local Rules of the United States District Courts for the Southern and Eastern District of New York, Rule 56.1(a). Likewise, "papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material

The facts are recounted "in the light most favorable to" Plaintiff, the non-movant.

*Torcivia v. Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021).  The facts as described below are

undisputed unless otherwise noted.

---

facts as to which it is contended that there exists a genuine issue to be tried." *Id.* 56.1(b).  Each
paragraph in both the movant and the non-movant's Rule 56.1 Statements "*must be followed by
citation to evidence which would be admissible*." *Id.* 56(d) (emphasis added).  "The purpose of
Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing
district courts from the need to hunt through voluminous records without guidance from the
parties." *Mayagüez S.A. v. Citibank, N.A.*, No. 16-CV-6788, 2022 WL 901627, at *8 (S.D.N.Y.
Mar. 25, 2022) (citation omitted).  "Accordingly, a Rule 56.1 statement is not itself a vehicle for
making factual assertions that are otherwise unsupported in the record." *PharmacyChecker.com
v. Nat'l Ass'n of Boards of Pharmacy*, No. 19-CV-7577, 2023 WL 2973038, at *2 (S.D.N.Y.
Mar. 28, 2023) (citation omitted).
          Here, Plaintiff purports to dispute a number of paragraphs in Defendant's Rule 56.1
Statement, but fails to provide any citation to the record *at all*, much less to any admissible
evidence.  (*See, e.g.*, Pl's 56.1 ¶¶ 12–15, 17 (disputing, without citation, "the exact order,
timing[,] and content" of certain conversations.)  Courts in this District have consistently
"interpreted . . . Local Rule 56.1 to provide that[,] where there are no[] citations or where the
cited materials do not support the factual assertions in the Statements, the [c]ourt is free to
disregard the assertion." *Nat'l Coal. on Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78,
107 (S.D.N.Y. 2023) (internal quotation marks and citation omitted) (collecting cases); *accord
Bank of Am., N.A. v. Greuner Med. P.C.*, No. 22-CV-9620, 2024 WL 182408, at *2 (S.D.N.Y.
Jan. 17, 2024); *AL Infinity, LLC v. Crown Cell, Inc.*, No. 20-CV-4813, 2023 WL 5097979, at *3
(S.D.N.Y. Aug. 9, 2023); *Ajaero v. S&P Glob. Inc.*, No. 21-CV-7894, 2023 WL 2390723, at *7
(S.D.N.Y. Mar. 7, 2023); *Nowlin v. Mount Sinai Health Sys.*, No. 20-CV-2470, 2022 WL
992829, at *1 n.1 (S.D.N.Y. Mar. 31, 2022); *see also Costello v. N.Y. State Nurses Ass'n*, 783
F. Supp. 2d 656, 661 n.5 (S.D.N.Y. 2011) (disregarding the plaintiff's responses to the
defendants' Rule 56.1 statement where the plaintiff, inter alia, "frequently fail[ed] to refer to any
evidence in the record to support her contention that certain facts [were] disputed"); .
Accordingly, the Court will deem admitted those paragraphs that Plaintiff fails to dispute with a
corresponding citation to admissible evidence.
          The Court also notes that both Parties improperly cite to Plaintiff's Complaint in certain
paragraphs of his Rule 56.1 Statement.  (*See, e.g.*, Pl's 56.1 ¶¶ 75, 96, 99–101; Def's 56.1 ¶¶ 1–
2.)  "It is blackletter law that an unverified complaint is not evidence that can be relied upon at
summary judgment." *Caro Cap., LLC v. Koch*, 653 F. Supp. 3d 108, 132 (S.D.N.Y. 2023); *see
also Bentivegna v. People's United Bank*, No. 14-CV-599, 2017 WL 3394601, at *13 (E.D.N.Y.
Aug. 7, 2017) ("[A]n unverified complaint is not admissible evidence."); *Cont'l Ins. Co. v. Atl.
Cas. Ins. Co.*, No, 07-CV-3635, 2009 WL 1564144, at *1 n.1 (S.D.N.Y. Jun. 4, 2009) (finding
that on a motion for summary judgment "allegations in an unverified complaint cannot be
considered as evidence." (citation omitted)).  The Court is therefore free to disregard these
unsupported assertions.

### 1.  The Parties

During the time period relevant to the instant Motion—specifically, February 2019—Plaintiff resided in Middletown, New York.  (*See* Decl. of Neil Shevlin, Esq. in Supp. of Mot. ("Shevlin Decl.") Ex. A ("Pl. Dep. Tr.") at 18:23–19:4, 21:16–22 (Dkt. No. 87-1).)[3]  Plaintiff was under parole supervision by the New York State Department of Corrections and Community Supervision ("DOCCS") at that time.  (Def's 56.1 ¶ 62; Pl's 56.1 ¶ 62.)

In February 2019, Defendant was a Trooper for the New York State Police ("NYSP"). (Def's 56.1 ¶ 4; Pl's 56.1 ¶ 4.)  As a Trooper, he was assigned to road patrol duty on I-84 out of the Montgomery, New York barracks (the "Montgomery Barracks").  (Def's 56.1 ¶ 4; Pl's 56.1 ¶ 4.)[4]  Troopers assigned to road patrol duty have a number of responsibilities, including ensuring the safety of roadways in New York, preventing and investigating crime, and providing support to other law enforcement agencies.  (Def's 56.1 ¶ 5; Pl's 56.1 ¶ 5.)

### 2.  Roadside Encounter on February 18, 2019

On February 18, 2019, Defendant was working either the 11:00 a.m. to 11:00 p.m. shift or the 12:00 p.m. to 12:00 a.m. shift.  (Def's 56.1 ¶ 6; Pl's 56.1 ¶ 6.)  Defendant's partner for that day was fellow NYSP Trooper Robert Brighton ("Brighton").  (Def's 56.1 ¶ 7; Pl's 56.1 ¶ 7.)  As relevant here, during his shift Defendant was driving a state-issued patrol car.  (Def's 56.1 ¶ 6; Pl's 56.1 ¶ 6.)

At around 8:30 p.m. that day, Defendant noticed a four-door 2001 Honda Accord (the "Honda") pulled over to the side of the westbound lanes of I-84, just before Exit 5.  (Def's 56.1

---

[3] Citations to deposition transcripts cite the internal page and line numbers therein.

[4] Although he is still employed by the NYSP, Defendant is now an Investigator working out of a barracks in Liberty, New York.  (Def's 56.1 ¶ 3; Pl's 56.1 ¶ 3.)

¶ 8; Pl's 56.1 ¶ 8; *see also id.* ¶ 69; Resp. to Pl's Counterstatement ¶ 69; Decl. of Lawrence

Berben ("Berben Decl.") ¶ 4 (Dkt. No. 91).)  Defendant also noticed that someone appeared to be

working on changing one of the Honda's tires.  (Def's 56.1 ¶ 9; Pl's 56.1 ¶ 9; *see also* Pl. Dep.

Tr. at 23:11–21, 25:7–24 (Plaintiff's deposition testimony noting that one of the Honda's tires

had gone flat).)  Thus, in order to assist the Honda's occupants and to ensure their safety while

the tire was being changed, Defendant pulled over directly behind the Honda with his back—or

"Level One"—lights activated so that others on I-84 would be aware of the Troopers' and the

Honda's presence on the side of the road.  (Def's 56.1 ¶ 10; Pl's 56.1 ¶ 10.)

      Upon pulling over behind the Honda, Defendant and Brighton exited their patrol car and

observed that the Honda had three occupants: (1) the driver, Jeffrey Garrison ("Jeff"); (2) a

passenger named Thomas Cunningham ("Tom"); and (3) Plaintiff, who was working on

changing the front passenger side tire.  (Def's 56.1 ¶ 11; Pl's 56.1 ¶ 11; *see also id.* ¶¶ 70–71, 73;

Resp. to Pl's Counterstatement ¶¶ 70–71, 73.)[5]  Because the Parties dispute certain aspects of

what happened after Defendant's and Brighton's arrival, each Party's narrative will be set forth

in turn.

### a. Defendant's Version of Events

      There is no dispute that, after arriving, Brighton spoke with Tom and Defendant spoke

with Jeff.  (Def's 56.1 ¶¶ 12–13; Pl's 56.1 ¶¶ 12–13.)[6]  While speaking with Jeff, Defendant

---

[5] There is no dispute that the Honda belonged to Jeff.  (Pl's 56.1 ¶ 70; Resp. to Pl's
Counterstatement ¶ 70.)

[6] Plaintiff asserts that, upon getting out of the patrol car, "Defendant approached Plaintiff
and began asking him questions, but Plaintiff asked Defendant to allow him to finish changing
the tire before speaking with him, so Defendant began speaking to the other two men."  (Pl's
56.1 ¶ 77(citing Pl. Dep. Tr. at 28:7–10).)  The Court notes that this dispute—such as it is—does
not create a *material* dispute as to the fact that Brighton and Defendant did, in fact, speak with
Jeff and Tom.  *See supra* note 2.

asked him where he was coming from and where he was going, to which Jeff responded that he and Tom had picked up Plaintiff in Newburgh, New York and that they were heading home to the Bloomingburg, New York area.  (Def's 56.1 ¶¶ 14–15; Pl's 56.1 ¶¶ 14–15.)  Jeff was not able to tell Defendant where in Newburgh he had picked up Plaintiff, but suggested that it might have been "off of Exit 8."  (Def's 56.1 ¶ 15; Pl's 56.1 ¶ 15.)  During this interaction, Jeff appeared to Defendant to be very nervous.  (Def's 56.1 ¶ 16; Pl's 56.1 ¶ 16.)

Defendant then switched places with Brighton and spoke with Tom.  (Def's 56.1 ¶ 17; Pl's 56.1 ¶ 17.)  In response to a similar line of questioning, Tom provided Defendant with the same information that Jeff had—that he and Jeff had picked up Plaintiff in Newburgh, New York and that they were heading home.  (Def's 56.1 ¶ 18; Pl's 56.1 ¶ 18.)

Thereafter, Defendant went to speak with Plaintiff, who was still working on changing the tire, but Plaintiff wanted to wait to speak with Defendant until after he finished with the tire.  (*See* Def's 56.1 ¶¶ 19–20; Pl's 56.1 ¶¶ 19–20.)  At that time, it appeared to Defendant that Plaintiff was nervous, and "his overall behavior seemed suspicious."  (Def's 56.1 ¶ 21; *see also* Berben Decl. ¶ 11 (Defendant's sworn statement that he "ha[s] a lot of experience dealing with people and something 'seemed off' with [Plaintiff]).)[7]  When Plaintiff did speak with Defendant, unlike Jeff and Tom, he told Defendant that the group had driven together to Newburgh and were leaving from Newburgh together.  (*See* Berben Decl. ¶ 12.)

After speaking with Plaintiff, Defendant contends that he then went back to Jeff and told Jeff that he had been given two different versions of events as to their whereabouts earlier that

---

[7] Plaintiff purports to dispute Defendant's impression of Plaintiff during this interaction, (*see* Pl's 56.1 ¶ 21), and, in doing so, relies upon his own testimony that, after Defendant started to speak with him, he simply "asked [Defendant], you know, can I just finish [changing the tire] for a second," (Pl. Dep. Tr. at 28:5–9).  However, this testimony does nothing to raise a genuine dispute regarding Defendant's subjective impression of Plaintiff's demeanor.  *See supra* note 2.

6

day—Jeff and Tom told Defendant that they drove to Newburgh to pick up Plaintiff, but Plaintiff told Defendant that all three men had driven to Newburgh together.  (*See* Berben Decl. ¶ 13.) According to Defendant, Jeff then became very nervous and repeated that he had picked up Plaintiff in Newburgh.  (*Id.*)  Something seemed "off" with Jeff, so Defendant asked him if there was something in particular that was making him nervous, such as something illegal in the car. (*Id.*)  Jeff denied that there was anything untoward "going on."  (*See id.*)

In light of his interactions with Jeff, Tom, and Plaintiff—and given that Jeff and Plaintiff seemed nervous, and that Plaintiff appeared "off" to Defendant—Defendant asked Jeff for his permission to search the Honda.  (*See* Def's 56.1 ¶¶ 22–23; Pl's 56.1 ¶¶ 22–23; *see also* Berben Decl. ¶ 14.)  Jeff gave his consent for Defendant to perform such a search.  (*See* Def's 56.1 ¶ 24; Pl's 56.1 ¶ 24.)  According to Defendant, before he began searching the car, he instructed Plaintiff—who was still changing the tire—to go to the front of the Honda.  (Berben Decl. ¶ 15.) As he began his search, Defendant noticed that Plaintiff was crouched down in front of the Honda, moving around, and otherwise acting "funny."  (*Id.* ¶¶ 15–16.)  Given that Plaintiff was kneeling down with his hands inside his sweatshirt and was moving around, Defendant asked him what he was doing and walked over to him.  (*Id.* ¶ 16.)  When he got to the front of the Honda, Defendant noticed a clear plastic bag containing a white powdery substance that appeared to be cocaine sticking out of the grill.  (*Id.*; *see also* Def's 56.1 ¶ 25.)  Defendant asserts that, after recovering the plastic bag, Jeff, Tom, and Plaintiff were each handcuffed and searched.  (*See* Def's 56.1 ¶ 26.)[8]

---

[8] Defendant prepared a Search Summary recounting his search of the Honda.  (*See* Def's 56.1 ¶ 60; Pl's 56.1 ¶ 60.)  In his Search Summary, Defendant reported that "the driver gave consent to search the [Honda;] while I began to search [the Honda,] I observed one of the passengers in the front of [the Honda] moving around excessively[.]  [U]pon approaching the

b.  Plaintiff's Version of Events

Plaintiff disputes certain aspects of Defendant's narrative.  Specifically, Plaintiff asserts that, when Defendant and Brighton pulled over behind the Honda, the weather was cold, he was tired and wearing only a hooded sweatshirt and sweatpants, and he wanted to change the tire and get home as quickly as possible.  (Pl's 56.1 ¶ 74.)[9]  After Plaintiff changed the tire, he put the flat tire in the Honda's trunk and then walked to the passenger side of the Honda, at which time Defendant asked him where the group was coming from and where they were going.  (*Id.* ¶ 78.)  In response, Plaintiff pointed toward the rear of the Honda, said they were "coming from that way," then pointed toward the front of the Honda, and said they were "going that way."  (*Id.* ¶ 79 (quoting Pl. Dep. Tr. at 30:20–31:4); *see also* Resp. to Pl's Counterstatement ¶ 79 (reflecting Defendant's admission that Plaintiff had responded to his question in this way).)  Plaintiff then asked, "what does that have to do with a flat tire?"  (Pl's 56.1 ¶ 80 (quoting Pl. Dep. Tr. at 31:5–6).)

According to Plaintiff, following that exchange Defendant said, "[o]h you are a wise ass, huh," and proceeded to conduct a pat-down frisk of Plaintiff, removing all of the personal items from his pockets and placing them on the Honda's hood.  (*Id.* ¶ 81 (quoting Pl. Dep. Tr. at 31:20–21).)  No drugs were recovered from Plaintiff's person.  (*Id.* ¶ 82; Resp. to Pl's Counterstatement ¶ 82.)  Indeed, Plaintiff denies having possessed any drugs on February 18, 2019, and avers that, to his knowledge, Jeff and Tom were not in possession of any drugs either.  (Pl's 56.1 ¶ 83.)

---

passenger I observed a clear plastic baggie containing a white powdery substance identified as cocaine . . . ."  (Berben Decl. Ex. G at 2 (capitalization adjusted for clarity) (Dkt. No. 91-7).)

[9] As noted above, Plaintiff contends that Defendant initially engaged Jeff, Tom, and Plaintiff all together before proceeding to speak with Jeff and Tom.  *See supra* note 6.

At that point, Plaintiff contends that Defendant told him to stand in front of the Honda while he searched it.  (Pl's 56.1 ¶ 84.)[10]  Plaintiff complied with that directive, and claims that he stood around ten to twelve feet in front of the Honda during the search.  (*Id.*)[11]

With respect to the plastic bag alleged to have contained cocaine, Plaintiff contends that Defendant informed him that Defendant had recovered it from under the Honda's hood.  (*See id.* ¶ 87.)  Plaintiff further asserts that he was never shown any "drugs alleged to have been recovered from" the Honda, nor did he witness Defendant search under the Honda's hood.  (*See* Pl's 56.1 ¶¶ 25, 88.)  In support of that assertion, Plaintiff cites testimony from his own deposition, where he testified that—as alleged in his Complaint—Defendant had told him that he was being arrested because Defendant found drugs under the hood of the car, but that he did not see Defendant search under the hood.  (*See* Pl. Dep. Tr. at 46:4–19.)[12]

---

[10] Plaintiff admits that Defendant's search of the Honda was conducted with Jeff's consent.  (Pl's 56.1 ¶ 24.)

[11] Plaintiff does not dispute that he was arrested after Defendant asserts that he recovered a white powdery substance from the Honda.  (*See* Pl's 56.1 ¶ 26 ("[d]en[ying]" the sequence of the "pat-down search," claiming that "Defendant conducted a pat-down search of Plaintiff during his initial questioning of Plaintiff as to where he was coming from and what his destination was, prior to searching [the Honda] or finding contraband").)

[12] The deposition testimony that Plaintiff relies upon is not a model of clarity.  When asked whether he alleged in his Complaint that he had never seen Defendant "search or look under the hood," Plaintiff responded, "[n]o."  (*See* Pl. Dep. Tr. at 46:11–14; *see also id.* at 46:15–16 ("Q.  You never [saw Defendant search or look under the hood]?  A.  No.").)  And although Plaintiff affirmed alleging in his Complaint that Defendant informed Plaintiff that Defendant had found cocaine, (*see id.* at 46:4–10), Plaintiff also denied that Defendant had told him at that time that he had found cocaine, (*see id.* at 46:20–22 (Q.  Did [Defendant] tell you what kind of drugs he had allegedly found?  A.  No, he didn't.")).

9

### 3.  Processing at the Montgomery Barracks

Following his arrest, Defendant and Brighton drove Plaintiff back to the Montgomery Barracks in their patrol car.  (*See* Def's 56.1 ¶ 27; Pl's 56.1 ¶ 27.)[13]  After arriving at the Montgomery Barracks, Plaintiff, Jeff, and Tom, were placed on a bench to await processing and interrogation.  (*See* Def's 56.1 ¶ 28; Pl's 56.1 ¶ 28.)  Defendant and Brighton then conducted a strip search of the three men.  (*See* Def's 56.1 ¶ 30; Pl's 56.1 ¶ 30.)[14]  During that search, Defendant recovered from Jeff a cut pink straw containing trace amounts of a white powdery residue, which Defendant believed to be cocaine.  (*See* Def's 56.1 ¶ 31; Pl's 56.1 ¶ 31.)

At the Montgomery Barracks, Brighton conducted a field test of the white powdery substance recovered from the Honda, which came back positive for cocaine.  (Def's 56.1 ¶ 29; Pl's 56.1 ¶ 29.)  Thereafter, Defendant vouchered into NYSP evidence both the plastic bag containing cocaine and the cut pink straw that he had recovered from Jeff.  (Def's 56.1 ¶ 32; Pl's 56.1 ¶ 32.)

While Plaintiff was in custody, Defendant prepared an Incident Report and Arrest Report, both alleging that Plaintiff was in possession of cocaine.  (Pl's 56.1 ¶ 92; Resp. to Pl's Counterstatement ¶ 92.)

---

[13] Plaintiff asserts that Tom was transported to the Montgomery Barracks in the back of Defendant's patrol car along with Plaintiff, and that Jeff was transported to the Barracks in a separate police car that had been called for back-up.  (*See* Pl's 56.1 ¶ 89.)

[14] Plaintiff does not challenge the propriety of this strip search in this Action.  (*See generally* Compl.)

### 4.  Interviews at the Montgomery Barracks

Pursuant to NYSP procedure, an Investigator—as opposed to a Trooper—"adopts," or is assigned, cases arising from felony-level arrests.  (Def's 56.1 ¶ 33; Pl's 56.1 ¶ 33.)[15]  Investigator Emily O'Connell ("O'Connell") was assigned the case stemming from Jeff, Tom, and Plaintiff's arrests.  (Def's 56.1 ¶ 34; Pl's 56.1 ¶ 34.)  O'Connell separately interviewed the three men the night of their arrest.  (Def's 56.1 ¶ 35; Pl's 56.1 ¶ 35.)[16]

O'Connell interviewed Tom first.  (*See generally* Interview Video.)  Tom explained that while he was sitting in the front passenger seat of the Honda earlier that day, Plaintiff had called Jeff and asked that they pick Plaintiff up in Newburgh, New York to take him home to the

---

[15] Plaintiff does not dispute that he was subjected to a felony-level arrest.  (*See* Pl's 56.1 ¶ 33.)

[16] In support of his Motion, Defendant has submitted a video recording reflecting O'Connell's interviews of Jeff, Tom, and Plaintiff.  (*See* Berben Decl. Ex. C ("Interview Video") (Dkt. No. 91-3).)  Plaintiff objects to the consideration of Jeff's and Tom's statements during their interviews on hearsay grounds.  (*See* Pl's 56.1 ¶¶ 36–40, 43–50; *see also* Pl's Mem. in Opp'n to Mot. ("Pl's Opp'n") 16 (Dkt. No. 92).)  Although the Court would agree if Defendant was offering these statements for their truth, *see* Fed. R. Evid. 801(c) (defining hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement"), the Court considers these statements for the limited purpose of assessing whether there was probable cause to prosecute Plaintiff, *see, e.g.*, *Martinez v. City of New York*, 564 F. Supp. 3d 88, 99 (E.D.N.Y. 2021) ("To establish probable cause, officers may rely on hearsay, and a court may properly consider such hearsay at summary judgment." (citing *United States v. Premises & Real Prop. at 4492 S. Livonia Rd.*, 889 F.2d 1258, 1267 (2d Cir. 1989)); *see also United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." (alteration and citation omitted)).

With respect to the portions of the Interview Video cited in Defendant's Rule 56.1 Statement relating to Jeff and Tom, the Court notes that, although he objects on hearsay grounds, Plaintiff conspicuously does not dispute the substance of that cited video evidence.  (*See* Pl's 56.1 ¶¶ 36–40, 43–50.)  *See Scarpinato v. 1770 Inn, LLC*, No. 13-CV-955, 2015 WL 4751656, at *2 n.3 (E.D.N.Y. Aug. 11, 2015) ("[A]ny of the [d]efendant['s] Rule 56.1 statements that are not specifically controverted are deemed admitted.").  Nevertheless, out of an abundance of caution, the Court has conducted an independent review of the Interview Video.

Bloomingburg, New York area, which Jeff and Tom did.  (*See id.* at 21:29–32, 21:36–37.)[17]

Tom told O'Connell that neither he nor Jeff had drugs on them that day.  (*See id.* at 21:33–34.)[18]

Tom also stated that, when they were on the side of I-84 with Defendant and Brighton, Plaintiff

appeared to be "nervous as hell."  (*See id.* at 21:34–35.)  Finally, Tom denied knowing where the

cocaine recovered during Defendant's search was from, but acknowledged that the drugs were

recovered in the area at the front of the Honda, near where Plaintiff was standing.  (*See id.* at

21:34–35, 21:37–38, 21:41–42.)

Next, O'Connell interviewed Jeff.  (Def's 56.1 ¶ 42; Pl's 56.1 ¶ 42.)  During his

interview, Jeff told O'Connell that Plaintiff had called him to ask him to pick Plaintiff up in

Newburgh, New York to take him home, and that Plaintiff had offered to pay Jeff to do so.  (*See*

Interview Video at 22:03–05.)  Jeff also explained that, when Plaintiff called asking to get picked

up, Plaintiff told Jeff that he had some "stuff," which Jeff understood to mean drugs.  (*See id.* at

22:10–11.)[19]  Thus, with respect to the cocaine recovered from the Honda, Jeff stated that he was

"pretty sure that shit" belonged to Plaintiff, and opined that Plaintiff had stuck the drugs into the

front of the Honda.  (*See id.* at 22:05–06, 22:10–11.)[20]  Further, Jeff stated that, when they were

---

[17] When citing the Interview Video, the Court cites to the timestamp provided at the lower lefthand corner of the video itself.

[18] Tom also stated that he did not know that Plaintiff had drugs on him that day.  (*See* Interview Video at 21:35–36.)

[19] The NYSP Incident Report relating to the February 18, 2019 roadside encounter states that Jeff and Tom agreed to pick Plaintiff up in exchange for heroin and had prior knowledge that Plaintiff possessed cocaine when they picked him up.  (*See* Berben Decl. Ex. F ("Incident Report") at 5 (Dkt. No. 91-6); *see also* Pl's 56.1 ¶¶ 58–59 (admitting that Defendant and O'Connell both worked on preparing the Incident Report in connection with their respective duties as NYSP employees).)

[20] The Court notes that Plaintiff "disputes" certain citations to the Interview Video, asserting that the cited timestamps reflect the wrong interviewee and that that interviewee is not

on the side of I-84 with Defendant and Brighton, Plaintiff was acting like he was "trying to hide something." (*See id.* at 22:05–06.) Jeff also told O'Connell that he had been buying drugs from Plaintiff for the around six or seven months, (*see id.* 22:07–09), and that Tom may have previously purchased drugs from Plaintiff as well, (*see id.* at 22:09–10).

Finally, O'Connell interviewed Plaintiff. (Def's 56.1 ¶ 51; Pl's 56.1 ¶ 51.) Plaintiff told O'Connell that Jeff and Tom had picked him up from his home in Middletown, New York. (*See* Interview Video at 22:47–48; *see also id.* at 22:45–46.)[21] With respect to the cocaine recovered from the Honda, Plaintiff assumed that it belonged to either Jeff or Tom, and that either Jeff or Tom may have purchased it in Newburgh. (*See id.* at 22:49–50; 22:56–57.) Plaintiff also suggested that he was in police custody because Jeff or Tom did not want to admit that the cocaine belonged to them. (*See id.* at 22:52–53 ("All [this] because somebody doesn't want to say something's theirs?").) Finally, Plaintiff reiterated that he did not have any drugs in his possession that day, given that he was on parole and any possession of drugs on his part would have been a violation of his parole. (Pl's 56.1 ¶ 91; Resp. to Pl's Counterstatement ¶ 91.)

---

making the statements referenced in Defendant's Rule 56.1 Statement. (*See* Pl's 56.1 ¶¶ 48–49, 51–54.) As Defendant points out, however, Plaintiff seems to have misinterpreted the citations that Defendant provided. (*See* Def's Reply Mem. of Law in Further Supp. of Mot. ("Def's Reply") 6 n.2 (explaining that Defendants citations were taken from the timestamps at the lower lefthand corner of the video, and that Plaintiff appeared to be relying instead on the timestamps reflected in the application used to open the video) (Dkt. No. 97).) Thus, Plaintiff fails to dispute these statements, and the Court will deem them admitted. *See supra* note 2; *see also Scarpinato*, 2015 WL 4751656, at *2 n.3 ("[A]ny of the [d]efendant['s] Rule 56.1 statements that are not specifically controverted are deemed admitted.").

[21] Although Defendant avers that Jeff, Tom, and Plaintiff were intending to drive to "Plaintiff's son's grandfather's house" in Middletown "to drop him off," (*see* Def's 56.1 ¶ 52), Plaintiff testified at his deposition that the group had already dropped Plaintiff's son off at his grandfather's house by the time they pulled over on I-84 with the flat tire, (*see* Pl. Dep. Tr. at 18:12–20:9; *see also* Interview Video at 22:53–54).

### 5.  Criminal Charges, Prosecution, and Related Parole Proceedings

Following his interrogation at the Montgomery Barracks, Plaintiff was initially charged

with Criminal Possession of a Controlled Substance in the Fourth Degree, in violation of N.Y.

Penal Law § 220.09, and Criminal Sale of a Controlled Substance in the Third Degree, in

violation of N.Y. Penal Law § 220.03.  (Def's 56.1 ¶ 55; Pl's 56.1 ¶ 55.)[22]  The next day,

February 19, 2019, Plaintiff was arraigned in Montgomery Town Court and was charged only

with Criminal Possession of a Controlled Substance in the Fourth Degree.  (Def's 56.1 ¶ 61; Pl's

56.1 ¶ 61.)[23]  Because Plaintiff was on parole at the time of his arrest, he was remanded on a

parole hold at his arraignment. (Pl's 56.1 ¶ 95; Resp. to Pl's Counterstatement ¶ 95.)  Plaintiff

remained in custody on a parole hold until January 21, 2020.  (Pl's 56.1 ¶ 102; Resp. to Pl's

Counterstatement ¶ 102.)

The criminal charges against Plaintiff were ultimately dismissed on October 29, 2019.

(*See* Shevlin Decl. Ex. G at 2 (Case Summary report stating that Plaintiff's criminal charge was

dismissed as of October 29, 2019) (Dkt. No. 87-7); *see also* Def's 56.1 ¶ 66; Pl's 56.1 ¶ 66.)

Additionally, as a result of his February 18, 2019 arrest, Plaintiff was declared delinquent

with respect to his parole release.  (Def's 56.1 ¶ 63; Pl's 56.1 ¶ 63.)  Plaintiff was also charged

with six violations of his parole release, which related to his alleged possession of cocaine, as

well as his presence outside of his approved residence and authorized geographical area without

the permission of his parole officer.  (Def's 56.1 ¶ 64; Pl's 56.1 ¶ 64.)  On or about February 22,

---

[22] Jeff and Tom were likewise charged with similar crimes.  (Def's 56.1 ¶¶ 56–57; Pl's 56.1 ¶¶ 56–57.)

[23] Defendant signed the Felony Complaint Form, charging Plaintiff with criminal possession of a controlled substance, upon which he was arraigned.  (Pl's 56.1 ¶ 93; Resp. to Pl's Counterstatement ¶ 93.)

2019, Plaintiff waived his preliminary hearing, as a result of which probable cause was found that Plaintiff had violated the terms of his parole.  (Def's 56.1 ¶ 65; Pl's 56.1 ¶ 65.)

On January 21, 2020, a Final Violation Hearing was held at which Plaintiff entered into a plea agreement pursuant to which he agreed to plead guilty to a parole violation for being outside of a specified geographic area as defined in writing by his parole officer without permission, in exchange for the remaining five violations of his parole release being dismissed with prejudice and his being restored to parole supervision.  (Def's 56.1 ¶ 67; Pl's 56.1 ¶ 67.)  Plaintiff was released from custody that same day.  (Pl's 56.1 ¶ 103; Resp. to Pl's Counterstatement ¶ 103.)

B.  Procedural History

The Court assumes the Parties' familiarity with the procedural history of this case as described in a prior Opinion & Order, and will therefore recount only the procedural background relevant to the instant Motion.  (*See* Opinion & Order ("MTD Op.") 5–6 (Dkt. No. 40).)

Plaintiff's Complaint was docketed on December 7, 2020.  (*See* Compl.)  On June 29, 2022, the Court denied Defendant's Motion To Dismiss the Complaint in part.  (*See* MTD Op. 16.)  Defendant filed his Answer to the Complaint on July 27, 2022.  (*See* Answer (Dkt. No. 43).)

Following discovery, which concluded on February 27, 2023, (*see* Dkt. No. 66), Defendant filed a pre-motion letter seeking leave to file the instant Motion, (*see* Letter from Bahiya Lawrence, Esq. to Court (Apr. 10, 2023) (Dkt. No. 69)).  Plaintiff filed his response on April 13, 2023.  (*See* Letter from Gabriella Orozco, Esq. to Court (Apr. 13, 2023) (Dkt. No. 71).) The Court adopted a briefing schedule for Defendant's Motion during a pre-motion conference on May 15, 2023.  (*See* Dkt. (minute entry for May 15, 2023); Mot. Scheduling Order (Dkt. No. 76).)

After requesting and receiving an extension to the deadlines in the briefing schedule, (*see* Dkt. Nos. 79–80), Defendant filed his Motion and accompanying papers on July 28, 2023.  (*See* Not. of Mot.; Def's Mem. of Law in Supp. of Mot. ("Def's Mem.") (Dkt. No. 84); Def's 56.1; Shevlin Decl. (Dkt. No. 87); Berben Decl.)[24]  On September 14, 2023, Plaintiff requested—and received—an extension of time to file his Opposition to Defendant's Motion.  (*See* Dkt. Nos. 89–90.)[25]  Pursuant to that extended deadline, Plaintiff filed his Opposition and accompanying papers on October 31, 2023.  (*See* Pl's Opp'n; Decl. of Lara Belkin, Esq. in Opp'n to Mot. ("Belkin Decl.") (Dkt. No. 93); Pl's 56.1.)  Defendant filed his Reply and accompanying papers on December 4, 2023.  (Def's Reply; Resp. to Pl's Counterstatement.)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (same); *Truitt v. Salisbury Bank & Tr. Co.*, 52 F.4th 80, 85 (2d Cir. 2022) (same); *Cambridge Funding Source LLC v. Emco Oilfield Servs. LLC*, No. 22-CV-10741, 2023 WL 7405862, at *4 (S.D.N.Y. Nov. 9, 2023) (same).  "In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in [his] favor."  *Torcivia*, 17 F.4th at 354; *see also Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) (same).  "The movant 'bears the initial burden of showing that there is no

---

[24] Although the Berben Declaration and accompanying exhibits were initially filed on July 28, 2023, those materials were refiled, without objection, on October 26, 2023 in light of an error with the initial filing.  (*See* Dkt. Nos. 86, 91.)

[25] Defendant received a corresponding extension to file is Reply.  (*See* Dkt. Nos. 89–90.)

genuine dispute as to a material fact.'" *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d

Cir. 2022) (quoting *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018)); *see also LaFontant v. Mid-*

*Hudson Forensic Psychiatric Ctr.*, No. 18-CV-23, 2023 WL 6610764, at *7 (S.D.N.Y. Oct. 10,

2023) (same); *Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL

838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

   "However, when the burden of proof at trial would fall on the non[-]moving party, it

ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an

essential element of the non[-]movant's claim," in which case "the non[-]moving party must

come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order

to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d

114, 123 (2d Cir. 2013) (alteration adopted) (internal quotation marks and citation omitted); *see*

*also U.S. Bank Nat'l Ass'n as Tr. for Reg. Holders of J.P. Morgan Chase Com. Mortg. Sec.*

*Corp., Multifamily Mortg. Pass-Through Certificates, Series 2017-SB42 v. 160 Palisades Realty*

*Partners LLC*, No. 20-CV-8089, 2022 WL 743928, at *3 (S.D.N.Y. Mar. 10, 2022) (same).

Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more

than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward

with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692

F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586–87 (1986)); *see also Jennifer Fung-Schwartz, D.P.M, LLC v.*

*Cerner Corp.*, No. 17-CV-233, 2023 WL 6646385, at *3 (S.D.N.Y. Oct. 12, 2023) (same), "and

cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co.*

*v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Kollias*

*v. Univ. of Rochester*, No. 18-CV-6566, 2023 WL 5608868, at *4 (W.D.N.Y. Aug. 30, 2023)

("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading." (quoting *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009))).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Seward v. Antonini*, No. 20-CV-9251, 2023 WL 6387180, at *12 (S.D.N.Y. Sept. 29, 2023) (quoting *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014)). "At this stage, 'the role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.'" *U.S. Sec. & Exch. Comm'n v. Amah*, No. 21-CV-6694, 2023 WL 6386956, at *8 (S.D.N.Y. Sept. 28, 2023) (alteration adopted) (quoting *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011)). Therefore, "a court's goal should be 'to isolate and dispose of factually unsupported claims.'" *Sullivan v. Nat'l Express LLC*, No. 21-CV-5789, 2023 WL 6279255, at *8 (S.D.N.Y. Sept. 26, 2023) (quoting *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp.*, 477 U.S. at 323–24)).

When ruling on a motion for summary judgment, a district court should "consider only evidence that would be admissible at trial." *Latimer v. Annucci*, No. 21-CV-1275, 2023 WL 6795495, at *3 (S.D.N.Y. Oct. 13, 2023) (citing *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998)). "'[W]here a party relies on affidavits or deposition testimony to establish facts, the statements must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *Mozzochi v. Town of Glastonbury*, No. 21-CV-1159, 2023 WL 3303947, at *3 (D. Conn. May 8, 2023) (quoting *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir.

18

2012) (quoting Fed. R. Civ. P.56(c)(4))); *see also E. Fishkill Fire Dist. v. Ferrara Fire Apparatus, Inc.*, No. 20-CV-576, 2023 WL 6386821, at *11 (S.D.N.Y. Sept. 28, 2023) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ." (internal citation omitted)); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (internal citation omitted)).

"As a general rule, 'district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage.'" *Parker v. Fantasia*, 425 F. Supp. 3d 171, 183 (S.D.N.Y. 2019) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"); *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (quotation marks omitted)).  Where the evidence presents "a question of 'he said, she said'" the court "cannot . . . take a side at the summary judgment stage." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash"); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that "[w]here each side . . . tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court").

However, although witness credibility is usually a question of fact for the jury, *Yu Zhang v. Sabrina USA Inc.*, No. 18-CV-12332, 2021 WL 1198932, at *3 (S.D.N.Y. Mar. 30, 2021), "[b]road, conclusory attacks on the credibility of a witness without more [are] insufficient to raise a genuine issue of material fact that would defeat a motion for summary judgment," *Sec. & Exch. Comm'n v. Airborne Wireless Network*, No. 21-CV-1772, 2023 WL 5938527, at *6 (S.D.N.Y. Sept. 12, 2023) (internal quotation marks and citation omitted); *see also Ezuma v. City Univ. of N.Y.*, 665 F. Supp. 2d 116, 128 (E.D.N.Y. 2009) ("If the moving party has made a properly supported motion for summary judgment, the plaintiff may not respond simply with general attacks upon the defendant's credibility." (alterations adopted) (internal citation omitted)).  Thus, "when opposing a motion for summary judgment, the non-moving party may not respond simply with general attacks upon the declarant's credibility, but rather must identify affirmative evidence from which a jury could find that the non-moving party has carried its burden of proof."  *Moritz v. Town of Warwick*, No. 15-CV-5424, 2017 WL 4785462, at *8 (S.D.N.Y. Oct. 19, 2017) (alterations adopted) (internal quotation marks and citation omitted); *see also Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 181 (E.D.N.Y. 2015) ("'Although credibility assessments are improper on a motion for summary judgment,' a court may be justified in dismissing a claim when the 'plaintiff's version of the events is in such discord with the record evidence as to be wholly fanciful.'" (quoting *Pulliam v. Lilly*, No. 07-CV-1243, 2010 WL 935383, at *5 (E.D.N.Y. Mar. 11, 2010))).

B.  Analysis

1.  Stop and Search

Plaintiff brings a claim against Defendant for the unlawful stop and search of his person in the absence of reasonable suspicion.  (Compl. ¶¶ 65–67.)  Defendant contends that summary

judgment on this claim is appropriate because "the undisputed evidence shows that Defendant had a reasonable suspicion that Plaintiff may be involved in criminal activity." (Def's Mem. 14.) Defendant also asserts that he is entitled to qualified immunity on this claim. (*See id.* at 24–25.)[26]  Plaintiff counters that there are issues of material fact that preclude summary judgment because, viewing the evidence in the light most favorable to Plaintiff, there is evidence in the record that Defendant frisked him on the side of I-84 without having the requisite reasonable suspicion. (Pl's Opp'n 11–14.)

"A Fourth Amendment 'seizure' occurs when police detain an individual under circumstances in which a reasonable person would believe he or she is not 'free to leave.'" *Rivera v. Town of New Fairfield*, No. 22-CV-1874, 2023 WL 6611062, at *4 (S. D.N.Y. Oct. 10, 2023) (*United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). "Beginning with *Terry v. Ohio*, 392 U.S. 1 [(1968)], the [Supreme] Court has recognized that a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further." *Hiibel v. Sixth Judicial Dist. Ct. of Nev., Humboldt Cnty.*, 542 U.S. 177, 185 (2004). "To ensure that the resulting seizure is constitutionally reasonable, a *Terry* stop must be limited. The officer's action must be justified at its inception, and . . . reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (quotation marks omitted) (alteration in original). "For example, the seizure cannot continue for an excessive period of time, or resemble a traditional arrest." *Id.* at 185–86 (citations omitted); *see also Gilles v. Repicky*, 511 F.3d 239, 245 (2d Cir. 2007) ("[A]n investigative detention must be temporary and last no longer than is

---

[26] Although Defendant's briefing on the issue of qualified immunity is cursory at best—and notably devoid of citations to relevant legal authority—the Court will address this issue as relevant in this Opinion & Order. (*See* Def's Mem. 24–25; Def's Reply 9–10.)

necessary to effectuate the purpose of the stop.  Similarly, the investigative methods employed

should be the least intrusive means reasonably available to verify or dispel the officer's suspicion

in a short period of time." (quotation marks omitted)).  "In assessing whether a detention is too

long in duration to be justified as an investigative stop, . . . it [is] appropriate to examine whether

the police diligently pursued a means of investigation that was likely to confirm or dispel their

suspicions quickly, during which time it was necessary to detain the [suspect]."  *United States v.*

*Sharpe*, 470 U.S. 675, 686 (1985).

With regard to reasonable suspicion, "[t]he reasonable suspicion standard is 'not high'

and is 'less demanding than probable cause, requiring only facts sufficient to give rise to a

reasonable suspicion that criminal activity *may* be afoot.'"  *United States v. Santillan*, 902 F.3d

49, 56 (2d Cir. 2018) (emphasis in original) (quoting *United States v. Singletary*, 798 F.3d 55, 60

(2d Cir. 2015)).  Notably, "[c]onduct that is as consistent with innocence as with guilt may

provide the basis for reasonable suspicion where there is some indication of possible illicit

activity."  *Id.* (citing *United States v. Padilla*, 548 F.3d 179, 187 (2d Cir. 2008)).  Although

"reasonable suspicion is a less demanding standard than probable cause and requires a showing

considerably less than preponderance of the evidence, the Fourth Amendment requires at least a

minimal level of objective justification for making the stop."  *Illinois v. Wardlow*, 528 U.S. 119,

123 (2000) (quotation marks omitted).  "The officer [making a *Terry* stop] . . . must be able to

articulate something more than an 'inchoate and unparticularized suspicion or "hunch."'"

*Alabama v. White*, 496 U.S. 325, 329 (1990) (alterations in original) (quoting *Terry*, 392 U.S. at

27).  "Reasonable suspicion is an objective standard; hence, the subjective intentions or motives

of the officer making the stop are irrelevant."  *United States v. Bayless*, 201 F.3d 116, 133

(2d Cir. 2000); *accord United States v. Harris*, No. 19-CR-746, 2021 WL 1512724, at *4 (S.D.N.Y. Apr. 16, 2021).

"In assessing the reasonableness of an officer's suspicion, [courts] must take into account the totality of the circumstances and must evaluate those circumstances through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Compton*, 830 F.3d 55, 61 (2d Cir. 2016) (quotation marks omitted); *see also Bobbit v. Marzan*, No. 16-CV-2042, 2020 WL 5633000, at *11 (S.D.N.Y. Sept. 21, 2020) ("Reasonable suspicion must be assessed 'in light of the totality of the circumstances known to the officers at the time the search was begun.'" (quoting *United States v. Chirino*, 483 F.3d 141, 148 (2d Cir. 2007))). "[T]he proper inquiry is not whether each fact considered in isolation denotes unlawful behavior, but whether all the facts taken together support a reasonable suspicion of wrongdoing." *United States v. Lee*, 916 F.2d 814, 820 (2d Cir. 1990); *see also Vasquez v. Maloney*, No. 15-CV-8848, 2020 WL 1309989, at *9 (S.D.N.Y. Mar. 19, 2020) (same), *aff'd*, 990 F.3d 232 (2d Cir. 2021).

"[T]he first step in any Fourth Amendment claim (or, as in this case, any [§] 1983 claim predicated on the Fourth Amendment) is to determine whether there has been a constitutionally cognizable seizure." *Rivera*, 2023 WL 6611062, at *4 (quoting *Medeiros v. O'Connell*, 150 F.3d 164, 167 (2d Cir. 1998)); *see also Brown v. City of Oneonta*, 221 F.3d 329, 340 (2d Cir. 2000) ("To prevail on a § 1983 claim under the Fourth Amendment based on an allegedly unlawful *Terry* stop, a plaintiff first must prove that he was seized."). Although the Parties fail to directly address this particular issue, this inquiry centers on whether a reasonable person would believe he or she is "free to leave" the relevant encounter with police officers. *Burden v. Incorporated Village of Port Jefferson*, 664 F. Supp. 3d 276, 285 (E.D.N.Y. 2023); *see also Rivera*, 2023 WL

6611062, at *4 (same). As relevant here, if a constitutionally cognizable seizure has occurred, the Court proceeds to the second step in the Fourth Amendment analysis—determining whether, in the context of an alleged "investigatory (or *Terry*) stop," such a stop was "based on a reasonable suspicion supported by articulable facts that criminal activity may [have been] afoot." *See Rivera*, 2023 WL 6611062, at *4 (quotation marks omitted).

As an initial matter, viewing the evidence in the light most favorable to Plaintiff and drawing all inferences in his favor—as it must, *see Torcivia*, 17 F.4th at 354—the Court concludes that Plaintiff has adduced sufficient evidence from which a reasonable factfinder could determine that, under the totality of the circumstances, a reasonable person in Plaintiff's position would not feel free to leave the encounter with Defendant on the side of I-84 on February 18, 2019, such that a constitutionally cognizable seizure took place. Specifically, there is evidence in the record that two NYSP Troopers—Defendant and Brighton—pulled over behind the Honda in a patrol car with its back lights flashing. (Def's 56.1 ¶¶ 10–11; Pl's 56.1 ¶¶ 10–11.) Additionally, accepting Plaintiff's version of events, there is evidence that Defendant asked, for no apparent reason, where Plaintiff, Jeff, and Tom were heading that night. (Def's 56.1 ¶¶ 14–15, 18; Pl's 56.1 ¶¶ 14–15, 18; *see also id.* ¶ 78.) Plaintiff also points to his testimony that, after Defendant was displeased with Plaintiff's response to Defendant's question, Defendant proceeded to frisk him, remove his personal property from his pockets, and instruct him to stand in front of the Honda before he began his search of the Honda. (Pl's 56.1 ¶¶ 81, 84.) Courts have noted that "[p]ertinent factors identifying a police seizure can include[, among other things,] the threatening presence of several officers[] . . . [and] language or tone indicating that compliance with the officer was compulsory[.]" *Lilly v. Town of Lewiston*, 449 F. Supp. 3d 190, 198 (W.D.N.Y. 2020) (quoting *Brown*, 221 F.3d at 340); *see also Rothman v. City of New York*,

No. 19-CV-225, 2019 WL 3571051, at *7 (S.D.N.Y. Aug. 5, 2019) (same).  In short, on this record, the Court cannot conclude, as a matter of law, that there was no Fourth Amendment seizure of Plaintiff for purposes of his stop-and-search claim.[27]

In addition, and again viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, the Court concludes that there is a dispute about whether there was sufficient evidence in the record from which a reasonable factfinder could determine that Plaintiff was subjected to a frisk of his person in the absence of the requisite reasonable suspicion.  Because an "officer's action must be justified at its inception," a court tasked with "reviewing the constitutionality of a frisk . . . must examine the facts that preceded the frisk."  *United States v. Weaver*, 9 F.4th 129, 140 (2d Cir. 2021) (en banc); *accord Walker v. Carrozzo*, 664 F. Supp. 3d 490, 510 (S.D.N.Y. 2023).

Here, Plaintiff has testified that, after he responded to Defendant's question regarding where he, Jeff, and Tom had been traveling the night of February 18, 2019, Defendant called him a "wise ass" and then frisked him, taking everything out of his pockets in the process.  (Pl. Dep. Tr. at 31:17–32:6, 32:19–33:22.)  Plaintiff also testified that, prior to that exchange and frisk, his only interaction with Defendant involved Defendant approaching and attempting to ask Plaintiff questions upon arriving, and that he responded by asking Defendant to allow him to finish changing the tire before they spoke any further.  (Pl's 56.1 ¶ 77; *see also* Pl. Dep. Tr. at 27:19–

---

[27] In support of his Motion, Defendant argues that "there was no Trooper-initiated stop" because Plaintiff, Jeff, and Tom had already pulled over by the time Defendant and Brighton arrived on the scene.  (Def's Mem. 15.)  However, Defendant's hyperliteral focus on the fact that Plaintiff, Jeff, and Tom were "already stopped" (i.e., no longer driving) fails to consider, much less rebut, whether Defendant's encounter with Plaintiff evolved into a *Terry* stop because, considering of the totality of the circumstances, a reasonable person in Plaintiff's position would have believed that he was not free to leave the encounter with Defendant.  *See, e.g.*, *Burden*, 664 F. Supp. 3d at 285.

28:10.)  Bearing in mind that a frisk must be justified at its inception, *see Weaver*, 9 F.4th at 140,

if it credited Plaintiff's testimony, a reasonable jury could conclude that Plaintiff was, in effect,

subjected to what amounted to an impermissible *suspicionless* frisk of his person, *see, e.g.*, *Floyd

v. City of New York*, 959 F. Supp. 2d 540, 567–69 (S.D.N.Y. 2013) (explaining that investigatory

stops and protective frisks must be carried out on the basis of reasonable suspicion); *see also

Hiibel*, 542 U.S. at 185 (same).

Defendant asserts that, under his version of events, he plainly had reasonable suspicion to

frisk Plaintiff given, at minimum, the conflicting information he received from Jeff, Tom, and

Plaintiff regarding their travel earlier on February 18, 2019, as well as Jeff and Plaintiff's

apparent nervousness when he interacted with them.  (Def's Mem. 15–16.)  *See also supra*

Section I.A.2.a.  Indeed, Defendant's version of events might well support a finding that

Defendant had reasonable suspicion that Plaintiff had been engaged in criminal conduct, but

insofar as Defendant raises "a question of 'he said, she said,' . . . the [C]ourt cannot . . . take a

side at the summary judgment stage."  *Fincher*, 604 F.3d at 726; *see also Kassel*, 272 F. Supp. 3d

at 535 ("[I]t is not the role of the Court at summary judgment to resolve [a] factual clash.");

*Santiago v. City of Yonkers*, No. 13-CV-1077, 2015 WL 6914799, at *2 (S.D.N.Y. Oct. 30,

2015) ("Where each party tells a story that is at least plausible and would allow a jury to find in

its favor, it is for the jury to make the credibility determinations and apportion liability, and not

for the court.").  In other words, it is for a jury to decide whether (or not) either Plaintiff's or

Defendant's version of events in fact took place on the night of February 18, 2019.

With respect to Defendant's argument that he had reasonable suspicion to frisk Plaintiff,

in part, because he had gathered conflicting information from Jeff, Tom, and Plaintiff regarding

their travels, (*see* Def's Mem. 15–16), the Court notes that—under Plaintiff's version of events—

26

Defendant would not have had the opportunity to learn the purportedly inconsistent information from Plaintiff before frisking him. That is, even assuming that Jeff and Tom told Defendant that they had picked up Plaintiff in Newburgh before the frisk of Plaintiff took place, (*see* Def's 56.1 ¶¶ 14–15, 18; Pl's 56.1 ¶¶ 14–15, 18.), Defendant would not have learned from Plaintiff that the group had driven together to Newburgh, (*see* Berben Decl. ¶ 12), because they had not yet discussed that topic.[28] Thus, the only fact that Defendant points to in order to establish reasonable suspicion for the frisk of Plaintiff that could have occurred prior to the frisk (under Plaintiff's version of the facts) is his view that Plaintiff and Jeff were nervous. (Def's 56.1 ¶¶ 16, 21.) However, "nervous behavior alone is generally insufficient to establish reasonable suspicion in the absence of other suspicious evidence." *United States v. Andrews*, No. 20-CR-285, 2022 WL 2301987, at *23 (E.D.N.Y. June 27, 2022) (collecting cases);[29] *Floyd*, 959 F. Supp. 2d at 614 (explaining that nervousness "standing alone" is an inadequate basis "for seizing, questioning, and potentially frisking a person under the Fourth Amendment").

---

[28] The Court also notes that the fact that Plaintiff told Defendant that he, Jeff, and Tom had driven together to Newburgh was not included in Defendants' Rule 56.1 Statement. (*See generally* Defs.' 56.1.) Local Rule 56.1 is designed to place the responsibility on the Parties to clarify the elements of the substantive law that remain at issue because they turn on contested facts. *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000); *see also Curtis v. Hilton Garden Inn N.Y./Cent. Park*, No. 18-CV-3068, 2022 WL 4095905, at *4 (S.D.N.Y. Sept. 7, 2022) ("The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties.") (citation omitted)). Thus, the Court cannot determine whether this fact is disputed and, regardless, is under no obligation to consider it. *Monahan*, 214 F.3d at 292 (holding that the trial court "is not required to consider what the parties fail to point out" in 56.1 statements (citation omitted)).

[29] The district court in *Andrews* adopted the cited report and recommendation. *See Andrews*, 2022 WL 2301987, at *1–4.

In sum, because there is a factual dispute about the extent to which Defendant had reasonable suspicion to frisk Plaintiff, Defendant's Motion with respect to Plaintiff's stop and search claim is denied.[30]

### 2. False Arrest

Plaintiff also brings a claim against Defendant, alleging that he was falsely arrested and imprisoned in violation of his rights under the Constitution.  (Compl. ¶¶ 68–71.)  In support of his Motion, Defendant argues that he is entitled to summary judgment on this claim because there was probable cause to arrest Plaintiff on February 18, 2019 based on the fact that cocaine was recovered during his search of the Honda.  (Def's Mem. 16–17.)  Defendant also asserts that he is entitled to qualified immunity on this claim.  (*See id.* at 24–25.)  For his part, Plaintiff contends that "there is a factual dispute over the issue of where, how, or whether drugs were recovered by Defendant" that precludes the Court from granting summary judgment in favor of Defendant on his false arrest claim.  (Pl's Opp'n 15–16.)

---

[30] With respect to Defendant's assertion that qualified immunity shields him from liability in connection with Plaintiff's stop and search claim, the Court notes that "summary judgment for defendants on grounds of qualified immunity is . . . appropriate only . . . if the evidence is such that, even when it is viewed in the light most favorable to the plaintiff and with all permissible inferences drawn in his favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right."  *Turner v. City of New York*, No. 18-CV-9626, 2019 WL 6173701, at *6 (S.D.N.Y. Nov. 19, 2019) (quoting *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003)).  "In the event that there are triable disputes as to the circumstances that could dictate whether the defendants could reasonably believe that his conduct was lawful, summary judgment based on an immunity defense must be denied."  *Allen v. N.Y.C. Dep't of Corr.*, No. 06-CV-7205, 2010 WL 1644943, at *15 (S.D.N.Y. Mar. 17, 2010), *report and recommendation adopted*, 2010 WL 1631404 (S.D.N.Y. Apr. 19, 2010).  As set forth above, there is a factual dispute regarding the events surrounding Defendant's frisk of Plaintiff.  Thus, the Court must deny summary judgment based on Defendant's asserted qualified immunity as to Plaintiff's stop and search claim.

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause is substantially the same as a claim for false arrest under New York law." *Beach v. City of New York*, No. 21-CV-6737, 2023 WL 5576398, at *3 (S.D.N.Y. Aug. 28, 2023) (alterations adopted) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).[31]   "To state a claim for false arrest under New York law, a plaintiff must show that: (1) the defendant intentionally confined the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise justified." *Roman v. City of Mount Vernon*, No. 21-CV-2214, 2023 WL 8719968, at *7 (S.D.N.Y. Dec. 18, 2023) (quotation marks omitted); *see also Hussey v. Rosen*, No. 23-CV-4378, 2023 WL 5611647, at *3 (S.D.N.Y. Aug. 28, 2023) (same).

"The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest under § 1983." *Dillon v. Rosen*, No. 22-CV-7035, 2022 WL 4538397, at *3 (S.D.N.Y. Sept. 28, 2022) (alteration adopted) (quoting *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007)); *see also Beach*, 2023 WL 5576398, at *3 ("The existence of probable cause to arrest is a defense to a false arrest claim.").   Accordingly, "a claim for false arrest will not lie so long as the arresting officer had probable cause to arrest the plaintiff for some crime." *Jaegly v. Couch*, 439 F.3d 149, 150 (2d Cir. 2006); *see also Delgado v. City of New York*, No. 19-CV-6320, 2023 WL 6390134, at *8 (S.D.N.Y. Oct. 2, 2023) ("Because

---

[31] Additionally, "[u]nder New York law, false arrest and false imprisonment are one and the same, and the elements for both are the same as for a false arrest claim under § 1983." *Hershey v. Goldstein*, 938 F. Supp. 2d 491, 515 (S.D.N.Y. 2013); *see also Posr v. Doherty*, 944 F.2d 91, 96–97 (2d Cir. 1991) (same); *Wright v. Rutulante*, No. 16-CV-10068, 2018 WL 1578172, at *4 (S.D.N.Y. Mar. 27, 2018) (same).   Accordingly, to the extent Plaintiff brings distinct false arrest and false imprisonment claims, the Court's analysis herein applies to them both equally.

probable cause to arrest constitutes justification, there can be no claim for false arrest where the arresting officer had probable cause to arrest the plaintiff." (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004))).

"Probable cause is 'a fluid concept not readily, or even usefully, reduced to a neat set of legal rules. While probable cause requires more than a mere suspicion of wrongdoing, its focus is on probabilities, not hard certainties.'" *King v. Nesto*, No. 19-CV-1466, 2023 WL 2456701, at *5 (D. Conn. Mar. 10, 2023) (alterations adopted) (quoting *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007)). "Thus, according to the Supreme Court, when courts review a situation frozen in ink and perform ex post facto probable cause analyses with the benefit of near-unlimited time, they are to think about 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Barkai v. Nuendorf*, No. 21-CV-4060, 2023 WL 2691712, at *18 (S.D.N.Y. Mar. 29, 2023) (quoting *Illinois v. Gates*, 462 U.S. 213, 241 (1983)).

Notably, "probable cause exists even where it is based upon mistaken information, so long as the arresting officer was reasonable in relying on that information." *Aurecchione v. Falco*, No. 22-CV-4538, 2023 WL 6255529, at *10 (S.D.N.Y. Sept. 25, 2023) (quoting *Bernard v. United States*, 25 F.3d 98, 103 (2d Cir. 1994)). Once a government official has a reasonable basis to believe that there is probable cause to arrest, the official "is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Garcia v. Does*, 779 F.3d 84, 93 (2d Cir. 2015) (quotation marks and citation omitted). "In sum, probable cause does not demand any showing that a good-faith belief be 'correct or [even] more likely true than false.' It requires only such facts as make wrongdoing or the discovery of evidence

thereof probable." *Walczyk*, 496 F.3d at 157 (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)).

"Generally speaking, officers have probable cause to arrest when they have 'reasonably trustworthy information as to facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'" *Taranto v. Putnam County*, No. 21-CV-2455, 2023 WL 6318280, at *8 (S.D.N.Y. Sept. 28, 2023) (quoting *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012)). As the Second Circuit has explained:

> To determine the existence of probable cause, a court considers the totality of the circumstances, based on a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest. The court considers those facts available to the officer at the time of the arrest and immediately before it. The significance of each of these factors may be enhanced or diminished by surrounding circumstances.

*Guan v. City of New York*, 37 F.4th 797, 804 (2d Cir. 2022) (quotation marks and citations omitted). Additionally, "when making a probable cause determination, police officers are entitled to rely on the allegations of fellow police officers." *United States v. Barnes*, No. 22-CR-109, 2022 WL 12399322, at *3 (S.D.N.Y. Oct. 21, 2022) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)).

"The burden of establishing the absence of probable cause rests on the plaintiff," and "[t]he question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Sethi v. Nassau County*, No. 11-CV-6380, 2014 WL 2526620, at *4 (E.D.N.Y. June 3, 2014) (citations omitted); *see also Nickey v. City of New York*, No. 11-CV-3207, 2013 WL 5447510, at *5 (E.D.N.Y. Sept. 27, 2013) ("[W]hen the facts material to a probable cause determination are undisputed, the matter is a question of law properly decided by the [c]ourt.").

"Even if probable cause to arrest is ultimately found not to have existed, an arresting

officer will still be entitled to qualified immunity from a suit for damages if he can establish that

there was 'arguable probable cause' to arrest." *Escalera*, 361 F.3d at 743.  "Arguable probable

cause exists if either (a) it was objectively reasonable for the officer to believe that probable

cause existed, or (b) officers of reasonable competence could disagree on whether the probable

cause test was met." *Walczyk*, 496 F.3d at 163 (citation and quotation marks omitted); *see also*

*Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010) (same).  Accordingly, "the analytically

distinct test for qualified immunity is more favorable to the officers than the one for probable

cause; arguable probable cause will suffice to confer qualified immunity for the arrest."

*Escalera*, 361 F.3d at 742 (quotation marks omitted).  "This forgiving standard protects 'all but

the plainly incompetent or those who knowingly violate the law.'" *Provost v. City of Newburgh*,

262 F.3d 146, 160 (2d Cir. 2001) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  To deny

a motion for summary judgment on qualified immunity grounds, a court must find that the

officer's judgment was "so flawed that no reasonable officer would have made a similar choice."

*Id.* (citation omitted).

Applying the foregoing principles here, the Court concludes that there is no genuine

dispute as to the facts giving rise to Defendants' probable cause to arrest Plaintiff on February

18, 2019.  It is undisputed that Defendant searched the Honda based on Jeff's explicit consent.

(Def's 56.1 ¶¶ 22, 24; Pl's 56.1 ¶¶ 22, 24.)[32]  Defendant points to evidence that, during the

---

[32] Given that Defendant searched the Honda with Jeff's consent—and that it is
undisputed that the Honda belonged to Jeff—the Court notes that there are no constitutional
concerns relating to the search of the Honda itself.  *See, e.g.*, *United States v. Okon*, No. 19-CR-
492, 2022 WL 4121142, at *3 (E.D.N.Y. Sept. 9, 2022) ("Officers may effectuate a search and
seizure of property without violating the Fourth Amendment if they have 'obtained the voluntary
consent of a person authorized to grant such consent[.]'" (quoting *United States v. Iverson*, 897
F.3d 450, 458 (2d Cir. 2018))); *Chambers v. Lombardi*, No. 17-CV-7557, 2020 WL 2097558, at

course of that search, he recovered a white powdery substance stashed in the Honda's grill that appeared, based on his experience as an NYSP Trooper, to be cocaine.  (Def's 56.1 ¶ 25; Berben Decl. ¶ 16.)  And although Plaintiff purports to dispute the fact that Defendant recovered that white powdery substance from the Honda on the basis that "Plaintiff was never shown the drugs alleged to have been recovered from the car," (Pl's 56.1 ¶ 25), Plaintiff also *admits* that "the white powder *that was recovered from the Honda*" ultimately turned out to be cocaine, (*see id.* ¶ 29 (emphasis added); *see also* Berben Decl. Ex. A at 2 (Field Test Affidavit indicating that the results of Brighton's field test on February 18, 2019 came back positive for cocaine) (Dkt. No. 91-1); *id.* Ex. B at 2 (Evidence Record reflecting that Defendant vouchered the cocaine recovered from the Honda into NYSP evidence on February 18, 2019) (Dkt. No. 91-2)).

Under New York law, it is generally a crime to possess a "narcotic drug."  *See, e.g.*, N.Y. Penal Law § 220.09 ("A person is guilty of criminal possession of a controlled substance in the fourth degree when he knowingly and unlawfully possesses[] . . . one or more preparations, compounds, mixtures[,] or substances containing a narcotic drug and said preparations, compounds, mixtures[,] or substances are of an aggregate weight of one-eighth ounce or more[.]").  Cocaine is among the substances classified as such a drug.  *See* N.Y. Pub. Health Law § 3306, Schedule II(b)(4); *see also* N.Y. Penal Law § 220.00(7) (defining "[n]arcotic drug" by reference to "any controlled substance listed in schedule I(b), I(c), II(b) or II(c) other than methadone," as contained in "section thirty-three hundred six of the public health law").  Thus, upon discovering what he believed—based on his experience—to be cocaine while searching the Honda, and considering, at minimum, the undisputed fact that both Plaintiff and Jeff seemed

---

*7 (S.D.N.Y. May 1, 2020) (concluding that the search of a car was constitutional where "[the p]laintiff gave [NYSP Troopers] his consent to search his car") (collecting cases).  (*See also* Def's 56.1 ¶¶ 22, 24; Pl's 56.1 ¶¶ 22, 24; *see also id.* ¶ 70; Resp. to Pl's Counterstatement ¶ 70.)

nervous to Defendant during their roadside encounter, (*see* Def's 56.1 ¶¶ 16, 20–21, 23; Pl's 56.1 ¶¶ 16, 20–21, 23),[33] Defendant was presented with "circumstances . . . sufficient to warrant a person of reasonable caution in the belief that" Plaintiff had committed an offense relating to the possession of a controlled substance, *Taranto*, 2023 WL 6318280, at *8 (quoting *Ackerson*, 702 F.3d at 19). In other words, Defendant had probable cause to arrest Plaintiff. *See, e.g.*, *Maryland v. Pringle*, 540 U.S. 366, 371–72 (2003) (holding that there was probable cause to believe that the plaintiff had possessed a controlled substance where he was in a car with two others, rolled-up cash and plastic bags of cocaine were accessible to all three men, and none of the men gave information about who owned the money or the cocaine); *Edwards v. Castro*, No. 16-CV-2383, 2018 WL 4680996, at *9 (S.D.N.Y. Sept. 28, 2018) (concluding that there had been probable cause to arrest the plaintiff where the defendant NYSP Troopers "found 501 grams of heroin and $1,190 in United States currency in a backpack on the floor of the front passenger seat" of a car); *De La Cruz v. City of New York*, No. 11-CV-8395, 2014 WL 3719164, at *5 (S.D.N.Y. June 26, 2014) (determining that there was probable cause to arrest the plaintiff, who was sitting in the back seat of a car, where the officers "recovered a large quantity of controlled substances from inside the [c]ar").

---

[33] Although Plaintiff denies that he was, in fact, nervous, (Pl's 56.1 ¶¶ 21, 23 (disputing Defendant's characterization of his demeanor as "nervous")), he offers no evidence to rebut the fact that, in Defendant's view, he *seemed* nervous, *see Reid v. City of Beverly Hills*, No. 06-CV-3972, 2007 WL 9711542, at *3 & n.5 (C.D. Cal. July 9, 2007) (noting that the plaintiff's assertion that he disputed that he "*was* nervous, [but] not that he appeared nervous to [the defendant officers,]" was insufficient to raise a genuine dispute of material fact as to the officers' perception of his nervousness, and concluding that the officers had probable cause to arrest the plaintiff (emphasis in original)), *aff'd*, 316 F. App'x 571 (9th Cir. 2009); *cf. Scarpinato*, 2015 WL 4751656, at *2 n.3 ("[A]ny of the [d]efendant['s] Rule 56.1 statements that are not specifically controverted are deemed admitted.").

Plaintiff argues that there "is a factual dispute over the issue of where, how, or whether drugs were recovered by Defendant," and in support of that argument points to evidence that "Plaintiff was not in possession of any drugs on the day of his arrest, and to his knowledge neither was [either] Tom or Jeff," and "Plaintiff was never shown the drugs allegedly recovered by Defendant, nor did he see Defendant search under the hood of the car." (Pl's Opp'n 15–16.) As an initial matter, the Court notes that the citations Plaintiff provides—Pl's 56.1 ¶¶ 3, 8—have nothing to do with those factual assertions. (*See* Pl's 56.1 ¶ 3 (admitting that Defendant is currently an NYSP Investigator); *id.* ¶ 8 (admitting that Defendant noticed the Honda pulled over on I-84).)[34] Further, and as noted, this argument is belied by the fact that Plaintiff has *admitted* that "the white powder th*at was recovered from the Honda*" ultimately tested positive for cocaine. (Pl's 56.1 ¶ 29 (emphasis added).) And in any event, based on the record before the Court, these facts do not create a genuine dispute as to any material fact.

With respect to his claim that he was never shown the recovered cocaine, Plaintiff fails to explain why that fact matters here, much less cite to any case supporting the notion that arrestees are somehow entitled to be shown any contraband found that supports probable cause for their arrest. Moreover, in relying on the assertion that he did not possess any cocaine that day (and that Jeff and Tom did not either, to his knowledge), Plaintiff misses the point, as "probable cause exists even where it is based upon mistaken information, so long as the arresting officer was reasonable in relying on that information." *See Aurecchione*, 2023 WL 6255529, at *10 (quoting *Bernard*, 25 F.3d at 103). Thus, even assuming arguendo that the cocaine did not belong to

---

[34] The third and eighth paragraphs of Plaintiff's Counterstatement of Facts to be Tried do not support those factual assertions either. (*See* Pl's 56.1 ¶ 71 (stating that Tom was a passenger in the Honda); *id.* ¶ 76 (stating that Plaintiff saw Defendant exit his patrol car while changing the Honda's tire).)

Plaintiff, and putting aside that a person can *possess* narcotics that he does not own, what matters for purposes of the probable-cause-to-arrest inquire is that Defendant had a reasonable basis to believe that there was probable cause to arrest Plaintiff; he simply was "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *See Garcia*, 779 F.3d at 93.[35]

In sum, because the undisputed evidence shows that Defendant had probable cause to arrest Plaintiff, the Court grants summary judgment his favor on Plaintiff's false arrest and false imprisonment claim.[36]

### 3.  Malicious Prosecution

Plaintiff also asserts that he was subjected to malicious prosecution in violation of his constitutional rights.  (Compl. ¶¶ 72–76.)  In support of his Motion, Defendant argues that Plaintiff has failed to adduce evidence that Defendant: initiated Plaintiff's prosecution; lacked probable cause to believe Plaintiff committed a crime; and acted with malice in connection with

---

[35] With regard to Plaintiff's claim that he never saw Defendant search under the Honda's hood, it is unclear to the Court how that fact is material.  It appears that this fact initially came from Plaintiff's Complaint.  (*See* Compl. ¶¶ 33–34 (alleging that, when asked why he was arresting Plaintiff, Defendant stated that "he had found cocaine under the hood of [the Honda,]" but that Defendant had not searched under the hood); *see also* Pl. Dep. Tr. at 46:4–10 (testimony affirming that Plaintiff so alleged).)  Insofar as Plaintiff continues to rely on the allegations in his Complaint, the Court reiterates that "an unverified complaint is not evidence that can be relied upon at summary judgment."  *Caro Cap., LLC*, 653 F. Supp. 3d at 132; *see also Gilmore*, 45 F. Supp. 3d at 322 (explaining that a non-moving party "cannot rely on the mere allegations or denials contained in the pleadings" when facing a motion for summary judgment (quotation marks omitted)).

[36] For substantially the same reasons, the Court likewise concludes that "it was objectively reasonable for the [Defendant] to believe that probable cause existed," or, at the very least, that "officers of reasonable competence could disagree on whether the probable cause test was met."  *See Walczyk*, 496 F.3d at 163.  Defendant therefore had "arguable probable cause" to arrest Plaintiff, and he is therefore also entitled to qualified immunity with respect to Plaintiff's false arrest claim.

the prosecution of Plaintiff.  (Def's Mem. 18–22.)  He also asserts that he is entitled to qualified

immunity on this claim.  (*See id.* at 24–25.)  In response, Plaintiff contends that summary

judgment on his malicious prosecution claim is inappropriate because there is a factual dispute as

to whether Defendant had probable cause to arrest Plaintiff.  (Pl's Opp'n 16–18.)

"While the tort of malicious prosecution protects against the consequences of wrongful

prosecution, public policy favors bringing criminals to justice, and accusers must be allowed

room for benign misjudgments.  The law therefore places a heavy burden on malicious

prosecution plaintiffs[.]"  *Smith–Hunter v. Harvey*, 734 N.E.2d 750, 752 (N.Y. 2000); *see also*

*Rothstein v. Carriere*, 373 F.3d 275, 282 (2d Cir. 2004) (same).  "In order to prevail on a § 1983

claim against a state actor for malicious prosecution, a plaintiff must show a violation of his

rights under the Fourth Amendment and must establish the elements of a malicious prosecution

claim under state law."  *Ames v. City of New York*, No. 20-CV-11081, 2023 WL 2647642, at *5

(S.D.N.Y. Mar. 27, 2023) (quoting *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d

Cir. 2010)).  "Under New York law, '[t]o prevail on a claim of malicious prosecution, four

elements must be shown: [i] the defendant initiated a prosecution against plaintiff, [ii] without

probable cause to believe the proceeding can succeed, [iii] the proceeding was begun with malice

and, [iv] the matter terminated in plaintiff's favor.'"  *Da Mata v. City of New York*, No. 21-CV-

155, 2023 WL 112449, at *11 (S.D.N.Y. Jan. 5, 2023) (alterations in original) (quoting *Ricciuti*

*v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)).  Additionally, "[f]or a malicious

prosecution claim under Section 1983, a plaintiff also must demonstrate a 'sufficient post-

arraignment liberty restraint.'"  *Kee v. City of New York*, 12 F.4th 150, 162 (2d Cir. 2021)

(quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000)).

### a.  Initiation of the Prosecution

With respect to Defendant's argument that Plaintiff cannot establish the first element of a malicious prosecution claim—i.e., that Defendant initiated the criminal proceedings against Plaintiff, (Def's Mem. 18–19)—Defendant misapprehends the law.  "To satisfy the first element of a malicious prosecution claim against a police officer, the 'plaintiff must show that the officer brought formal charges and had the person arraigned, or filled out complaining and corroborating affidavits[,] *or swore to and signed a felony complaint*.  Alternatively, an officer initiates a prosecution by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor.'"  *Rutherford v. City of Mount Vernon*, — F. Supp. 3d —, 2023 WL 6395375, at *16 (S.D.N.Y. Sept. 29, 2023) (emphasis added) (quoting *Israel v. City of New York*, No. 16-CV-6809, 2018 WL 11219076, at *6 (S.D.N.Y. Sept. 29, 2018)); *see also Aguirre v. City of New York*, No. 15-CV-6043, 2017 WL 4236552, at *9 (E.D.N.Y. Sept. 22, 2017) (same).  However, "if the prosecution relied on independent, untainted information to establish probable cause, a complaining official will not be responsible for the prosecution that follows."  *Roman*, 2023 WL 8719968, at *12 (alteration adopted) (citation omitted).  "Where this is the case, the chain of causation is broken by the intervening exercise of independent judgment."  *Id.* (alteration adopted) (quotation marks and citation omitted); *accord Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999).

Here, it is undisputed that Defendant signed the criminal complaint upon which Plaintiff was indicted.  (Pl's 56.1 ¶¶ 93–94; Resp. to Pl's Counterstatement ¶¶ 93–94; *see also* Berben Decl. Ex. D at 2 (Felony Complaint against Plaintiff with Defendant named as Complainant) (Dkt. No. 91-4).)  Courts have consistently concluded that "[b]y swearing to and signing the charging instruments, [officer defendants] participate[] in the initiation of the prosecution."

*Roman*, 2023 WL 8719968, at *13 (explaining that two defendant officers "participated in the initiation of the prosecution" when one "swore to a felony complaint that charged [the p]laintiff with attempted assault in the second degree" and the other "signed a superseding misdemeanor information that charged [the p]laintiff" with various crimes); *see also Ricciuti*, 124 F.3d at 130 ("[A] jury could clearly find that [defendant] started the assault prosecution because no one disputes that he started the prosecution by filing the charges of second-degree assault."); *Rounseville v. Zahl*, 13 F.3d 625, 628 (2d Cir. 1994) ("[D]efendants swore out an accusatory instrument, which would appear under New York law to satisfy the requirement that the defendants' initiated a criminal proceeding against [plaintiffs]."); *Delanuez v. City of Yonkers*, No. 20-CV-4476, 2022 WL 16540682, at *7 (S.D.N.Y. Oct. 28, 2022) (holding that a plaintiff satisfied the first element of a malicious prosecution claim "by showing that officers . . . swore to and signed a felony complaint" (quoting *Llerando-Phipps v. City of New York*, 390 F. Supp. 2d 372, 382–83 (S.D.N.Y. 2005))); *Rodriguez v. City of New York*, 291 F. Supp. 3d 396, 406, 414 (S.D.N.Y. 2018) (determining that a reasonable jury could conclude that the officer who signed a criminal complaint initiated proceedings against the plaintiff); *Struthers v. City of New York*, No. 12-CV-242, 2013 WL 2390721, at *10 (E.D.N.Y. May 31, 2013) (holding that the plaintiff had satisfied first element of a malicious prosecution claim, initiating a prosecution against plaintiff, where defendant "swore out the criminal complaint" charging defendant).

Although the chain of causation can be broken where "the prosecution relied on independent, untainted information to establish probable cause," *Roman*, 2023 WL 8719968, at *12 (citation omitted), there appears to be no evidence in the record regarding this particular issue.  Indeed, Defendant simply asserts, without citation, that "the District Attorney's Office . . . initiated criminal proceedings against Plaintiff."  (Def's Mem. 19.)  However, that statement,

without more, fails to demonstrate that, as a matter of law, the District Attorney's Office made

an independent decision that broke the chain of causation.  *See Rutherford*, 2023 WL 6395375, at

*17 (declining to grant summary judgment against a defendant officer because "[the officer]

prepared the original accusatory instrument used in the prosecution of [the plaintiff], and there

[was] no evidence that a prosecutor independently made the decision to charge [the plaintiff]").

Thus, the Court will not grant summary judgment in Defendant's favor on the basis that

Defendant did not initiate Plaintiff's prosecution for purposes of his malicious prosecution claim.

### b.  Probable Cause

The Court next considers Defendant's contention that there was probable cause to believe

that Plaintiff had committed a crime.  (Def's Mem. 19–21.)  "Probable cause is a complete

defense to malicious prosecution."  *Rutherford*, 2023 WL 6395375, at *18 (quotation marks

omitted); *see also Manganiello*, 612 F.3d at 161–62 (same); *V.A. v. City of New York*, No. 22-

CV-773, 2023 WL 6254790, at *8 (S.D.N.Y. Sept. 26, 2023) (same).  "In the context of a

malicious prosecution claim, probable cause under New York law is 'the knowledge of facts,

actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful

grounds for prosecuting the defendant in the manner complained of.'"  *Kurtz v. Hansell*, 664

F. Supp. 3d 438, 452 (S.D.N.Y. 2023) (quoting *Rounseville*, 13 F.3d at 629); *see also Stukes v.

City of New York*, No. 13-CV-6166, 2015 WL 1246542, at *5 (E.D.N.Y. Mar. 17, 2015)

("Probable cause, in the context of a malicious prosecution claim, 'consists of such facts and

circumstances as would lead a reasonably prudent person in like circumstances to believe

plaintiff guilty.'" (quoting *Colon v. City of New York*, 455 N.E.2d 1248, 1250 (1983))).  "The

Second Circuit has clarified that 'probable cause' for a malicious prosecution claim means

'probable cause to believe that [the prosecution] could succeed[.]'"  *Delanuez*, 2022 WL

16540682, at *8 (alterations in original) (quoting *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003))). In this context, courts "consider[] the 'facts known or reasonably believed at the time the prosecution was initiated[.]'" *Soto v. City of New York*, 132 F. Supp. 3d 424, 452 (E.D.N.Y. 2015) (quoting *Castro v. County of Nassau*, 739 F. Supp. 2d 153, 169 (E.D.N.Y. 2010)). Notably, "[t]he probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases." *Lewis v. Westchester County*, No. 20-CV-9017, 2023 WL 5610302, at *5 (S.D.N.Y. Aug. 30, 2023) (quoting *Stansbury v. Wertman*, 721 F.3d 84, 95 (2d Cir. 2013)).

As in the false arrest context, given that probable cause it a complete defense to malicious prosecution claims, "the standard of qualified immunity [i]s one of arguable probable cause." *Hutchins v. Solomon*, No. 16-CV-10029, 2018 WL 4757970, at *21 (S.D.N.Y. Sept. 29, 2018) (quotation marks omitted) (quoting *Betts v. Shearman*, No. 12-CV-3195, 2013 WL 311124, at *4 (S.D.N.Y. Jan. 24, 2013)). "Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well-established law." *Id.* (emphasis in original) (quoting *Cerrone v. Brown*, 246 F.3d 194, 202–03 (2d Cir. 2001)). Again, "an officer is entitled to qualified immunity if (1) 'it was objectively reasonable for the officer to believe that probable cause existed,' or (2) 'officers of reasonable competence could disagree on whether the probable cause test was met.'" *Id.* (quoting *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)); *see also Betts*, 2013 WL 311124, at *4 (same).

The Court concludes that the undisputed "facts and circumstances" surrounding the relevant events on February 18, 2019 "would lead a reasonably prudent person" in Defendant's position to believe that Plaintiff was guilty of possessing a controlled substance. *See Stukes*,

Case 7:20-cv-10231-KMK-JCM   Document 99   Filed 03/22/24   Page 42 of 49

2015 WL 1246542, at *5 (citation omitted).  As noted above, Defendant had probable cause to arrest Plaintiff in light of the totality of the circumstances confronting him after he stopped to assist the Honda on the side of I-84—namely, the recovery of a white powdery substance during Defendant's search of the Honda and the undisputed fact that both Plaintiff and Jeff appeared to Defendant to be unusually nervous.  *See supra* Section II.B.2.[37]  Following his arrest, Plaintiff was transported to the NYSP's Montgomery Barracks.  (Pl's 56.1 ¶ 89; Resp. to Pl's Counterstatement ¶ 89.)  Once there, during the course of an unchallenged strip search, Defendant recovered a cut pink straw from Jeff containing trace amounts of a white powdery residue, which Defendant believed to be cocaine.  (*See* Def's 56.1 ¶¶ 30–31; Pl's 56.1 ¶¶ 30–31.) Although the quantity of the residue on the straw was too small to test, the powdery substance recovered from the Honda was subjected to a field test, and the results came back positive for cocaine.  (Def's 56.1 ¶¶ 29, 31; Pl's 56.1 ¶¶ 29, 31.)

Then, O'Connell interviewed Tom, Jeff, and Plaintiff, respectively.[38]  During those interviews, both Tom and Jeff explained that they had picked Plaintiff up in Newburgh and were traveling toward his home in the Bloomingburg area.  (*See* Interview Video at 21:29–32, 21:36–37 (Tom's statement); *id.* at 22:03–04 (Jeff's statement).)  However, Plaintiff reported to

---

[37] In bears repeating that Plaintiff has *admitted* that "the white powder [] *was recovered from the Honda*[.]"  (Pl's 56.1 ¶ 29 (emphasis added).)

[38] Although the focus of this case is Defendant, the Court notes that "the knowledge of one law enforcement officer [can] be imputed to another for the purposes of probable cause." *Williams v. City of New York*, No. 20-CV-5995, 2023 WL 8603028, at *3 (S.D.N.Y. Dec. 12, 2023) (citation omitted); *see also Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) ("Police officers, when making a probable cause determination, are entitled . . . to rely on the allegations of fellow police officers."); *Hayes v. Condlin*, No. 22-CV-7295, 2024 WL 776082, at *9 (S.D.N.Y. Feb. 26, 2024) (same).
The Court also reiterates that Plaintiff has not disputed the substance of any of the statements made to O'Connell.  *See supra* note 16.

O'Connell that Jeff and Tom had picked him up from his home in or around Middletown, not in Newburgh. (*See id.* at 22:47–48; *see also id.* at 22:45–46.)  Beyond these inconsistent accounts between Tom and Jeff on the one hand and Plaintiff on the other, Tom stated that Plaintiff appeared to be "nervous as hell" after Defendant and Brighton arrived behind the Honda on the side of I-84. (*See id.* 21:34–35.)  Tom also acknowledged that the cocaine was recovered near where Plaintiff was standing during Defendant's search of the Honda, (*see id.* at 21:34–35, 21:37–38, 21:41–42), as did Jeff, (*see id.* at 22:05–06).  Jeff further explained that when Plaintiff called asking to get picked up, Plaintiff told Jeff that he had some "stuff," which Jeff understood to mean drugs, (*see id.* at 22:10–11), and that Jeff was therefore "pretty sure that shit" (i.e., the cocaine) belonged to Plaintiff, (*see id.* at 22:05–06, 22:10–11; *see also* Incident Report at 5 (stating that Jeff and Tom agreed to pick Plaintiff up in exchange for heroin and had prior knowledge that Plaintiff possessed cocaine when they picked him up)).  Jeff also told O'Connell that he had been buying drugs from Plaintiff for around six or seven months, (*see* Interview Video at 22:07–09), and that Tom may have previously purchased drugs from Plaintiff as well, (*see id.* at 22:09–10).

Finally, rather than state that no cocaine had been recovered from the Honda, the night of the roadside encounter with Defendant, Plaintiff told O'Connell that he assumed the cocaine belonged to either Jeff or Tom, and that either Jeff or Tom could have purchased it in Newburgh. (*See id.* at 22:49–50; 22:56–57.)  Plaintiff also suggested that he was in police custody that night because Jeff or Tom did not want to admit that the cocaine belonged to them. (*See id.* at 22:52–53 ("All [this] because somebody doesn't want to say something's theirs?").)[39]

---

[39] The Court notes that such direct evidence renders Plaintiff's post-hoc attempt to argue that the cocaine was somehow planted or otherwise fabricated utterly unconvincing. *See Alli v. City of New York*, No. 21-CV-4866, 2023 WL 6393403, at *3 (S.D.N.Y. Sept. 29, 2023)

In short, based on the totality of these undisputed facts and circumstances, the Court has little trouble concluding that a reasonable person in Defendant's position would be "justif[ied] . . . in the belief that [they] ha[d] lawful grounds for prosecuting" Plaintiff for criminal possession of a controlled substance. *See Kurtz*, 664 F. Supp. 3d at 452 (quoting *Rounseville*, 13 F.3d at 629); *see also Delanuez*, 2022 WL 16540682, at *8 (explaining that "probable cause for a malicious prosecution claim means probable cause to believe that the prosecution [against the plaintiff] could succeed" (alterations adopted and quotation marks omitted) (quoting *Boyd*, 336 F.3d at 76)).

In response to Defendant's Motion, Plaintiff merely reasserts that Defendant could not have had probable cause to *prosecute* him because there are disputed facts relating to whether there was probable cause to *arrest* Plaintiff. (Pl's Opp'n 17.)  Putting aside the fact that Plaintiff ignores the possibility that facts could have arisen following his arrest that gave rise to probable cause to prosecute him (as the record suggests they did here), the Court has already rejected this assertion above in connection with its analysis of Plaintiff's false arrest claim. *See supra* Section II.B.2.  Thus, the Court grants summary judgment in Defendant's favor on Plaintiff's malicious

---

("Incontrovertible evidence relied on by the moving party, such as relevant videotape whose accuracy is unchallenged, should be credited by the court on . . . a [summary judgment] motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party." (quoting *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007))); *Cambridge Cap. LLC v. Ruby Has LLC*, — F. Supp. 3d —, 2023 WL 3956868, at *25 (S.D.N.Y. June 2, 2023) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *see also infra* Section II.B.4.

prosecution claim because there was probable cause to prosecute Plaintiff for, at minimum, criminal possession of a controlled substance.[40]

### c.  Malice

Because there was probable cause to prosecute Plaintiff, the Court declines to address whether Defendant acted with malice.  *See Watson v. Grady*, No. 09-CV-3055, 2015 WL 2168189, at *20 (S.D.N.Y. May 7, 2015) (declining to address malice where court found prosecution of plaintiff was supported by probable cause), *aff'd sub nom. Watson v. Sims*, 648 F. App'x 49 (2d Cir. 2016) (summary order); *see also Soto*, 132 F. Supp. 3d at 451 (same).

### 4.  Fair Trial

Finally, Plaintiff alleges that Defendant violated his right to a fair trial by fabricating evidence that he possessed cocaine on February 18, 2019.  (Compl. ¶¶ 77–81.)  Defendant argues that he is entitled to summary judgment on this claim because Plaintiff has failed to adduce evidence that he fabricated any evidence against Plaintiff and that Plaintiff cannot show any cognizable deprivation of life, liberty, or property resulting from Defendant's conduct.  (Def's Mem. 22–24.)[41]  In response, Plaintiff avers that there remain material factual disputes that preclude the entry of judgment in Defendant's favor on his fair trial claim.  (Pl's Opp'n 18.)

"To prove a [§] 1983 fair trial claim, a plaintiff must establish that (1) the officer created false information, (2) the officer forwarded the false information to prosecutors, (3) the false

---

[40] In light of its determination as to Defendant's probable cause to prosecute Plaintiff, the Court necessarily concludes that "it was objectively reasonable for the [Defendant] to believe that probable cause existed," or, at the very least, that "officers of reasonable competence could disagree on whether the probable cause test was met."  *See Hutchins*, 2018 WL 4757970, at *21. Defendant therefore had "arguable probable cause" to prosecute Plaintiff, and he is therefore also entitled to qualified immunity with respect to Plaintiff's malicious prosecution claim.

[41] Defendant does not appear to assert that he is entitled to qualified immunity with respect to Plaintiff's fair trial claim.  (*See* Def's Mem. 24–25; Def's Reply 9–10.)

information was likely to influence a jury's decision, and (4) the plaintiff suffered a deprivation of life, liberty, or property as a result of the officer's actions." *Kee*, 12 F.4th at 168 (citation omitted); *see also Bellamy v. City of New York*, 914 F.3d 727, 745 (2d Cir. 2019) ("When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial." (citation omitted)).   "[A §] 1983 fair trial claim is available to a defendant even if the underlying criminal charges are dismissed and the fabricated evidence is never presented at trial." *Kee*, 12 F.4th at 168 (citing *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 249–50 (2d Cir. 2020)).   Indeed, "a [§] 1983 claim for the denial of a right to a fair trial based on an officer's provision of false information to prosecutors can stand even if the officer had probable cause to arrest the [§] 1983 plaintiff," meaning that "fair trial claims cover kinds of police misconduct not addressed by false arrest or malicious prosecution claims."  *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277–78 (2d Cir. 2016); *see also Taranto*, 2023 WL 6318280, at *9 ("Probable cause is not a defense to a denial of fair trial claim."); *Heard v. City of New York*, 319 F. Supp. 3d 687, 697 (S.D.N.Y. 2018) (same); *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276 (S.D.N.Y. 2010) (noting that the Second Circuit has permitted "claims for both malicious prosecution and a denial of [a plaintiff's] fair right to trial based on the same alleged fabrication of evidence"). "Where the plaintiff asserts a [§] 1983 fair-trial claim based on fabricated evidence, all that is required is that the underlying criminal proceeding be terminated in such a manner that the lawsuit does not impugn an ongoing prosecution or outstanding conviction."  *Smalls v. Collins*, 10 F.4th 117, 139 (2d Cir. 2021) (emphasis omitted).

In response to Defendant's Motion, Plaintiff asserts that "Plaintiff testified that he did not have any drugs on February 18, 2019, that neither did Tom or Jeff, to his knowledge, that he

never saw Defendant recover drugs from the front of the car on that day, and that he was never shown the drugs allegedly recovered."  (Pl's Opp'n 18 ("There is no information relating to the truth of Defendant's contention that he found the alleged drugs in the location he claims to have.").)  Putting to the side the fact that Plaintiff's analysis is bereft of *any* citations to supporting caselaw (or, indeed, to the record itself), he has failed to demonstrate that there is a genuine dispute as to any material fact here.  As discussed above, it is undisputed that a white powdery substance recovered from the Honda was subjected to a field test at the Montgomery Barracks, the results of that test came back positive for cocaine, and that Defendant vouchered the cocaine into NYSP evidence.  (Def's 56.1 ¶¶ 29, 32; Pl's 56.1 ¶¶ 29, 32.)  In fact, Plaintiff acknowledged the recovery of contraband from the Honda during his interview with O'Connell, which occurred the same night has the roadside encounter with Defendant on I-84.  (*See, e.g.*, Interview Video at 22:49–50; 22:56–57.)  Thus, it would be no more than pure speculation to infer that there was no cocaine found in the Honda based only on Plaintiff's post-hoc, self-serving contentions; simply put, "Plaintiff[] cannot withstand summary judgment by making unsubstantiated, convenient claims—[in essence], that someone must have planted the [cocaine], or that [Defendant] would have notified [P]laintiff[] immediately [or shown him] that he had discovered [cocaine] if his discovery were genuine."  *Apostol v. City of New York*, No. 11-CV-3851, 2014 WL 1271201, at *6 (E.D.N.Y. Mar. 26, 2014), *aff'd*, 607 F. App'x 105, 107 (2d Cir. 2015) (summary order); *see also Gutierrez v. New York*, No. 18-CV-3621, 2021 WL 681238, at *18 (E.D.N.Y. Feb. 22, 2021) ("Although plaintiffs can generally rely on their own testimony to demonstrate a genuine dispute of material fact, plaintiff offers no evidence in support of his claims that the evidence was planted, which alone are insufficient to withstand summary judgment for false evidence allegations." (citations and quotation marks omitted)); *Isaac v. City*

*of New York*, No. 16-CV-4729, 2020 WL 1694300, at *9 (E.D.N.Y. Apr. 6, 2020) (granting

summary judgment to defendants where "[the p]laintiff claim[ed] that the testimony of four

witnesses and [the] defendant . . . was false, but offer[ed] no evidence in support, other than his

own testimony"); *Carlisle v. City of New York*, No. 05-CV-6825, 2007 WL 998729, at *3

(S.D.N.Y. Apr. 2, 2007) ("[P]laintiff's unsupported, conclusory allegation that someone must

have planted the evidence because there is no other way it could have gotten [there] is not

sufficient to defeat a motion for summary judgment." (alterations in original)).

 In short, Plaintiff's arguments in response to Defendant's Motion do nothing more than

support a fleeting "metaphysical doubt" concerning whether Defendant fabricated evidence,

which is not enough to survive a motion for summary judgment, *see Matsushita Elec. Indus. Co.*,

475 U.S. at 586; *see also 183 Bronx Deli Grocery Corp. v. United States*, No. 11-CV-1527, 2012

WL 2359664, at *3 (S.D.N.Y. June 18, 2012) ("The non-movant cannot avoid summary

judgment simply by asserting a metaphysical doubt as to the material facts, and may not rely on

mere conclusory allegations nor speculation, but instead must offer some *hard evidence* showing

that its version of the events is not wholly fanciful." (emphasis added) (citations and quotation

marks omitted)).  Accordingly, Defendant's Motion is granted as to Plaintiff's fair trial claim.[42]

### III.  Conclusion

 For the reasons stated above, Defendant's Motion for Summary Judgment is granted in

part and denied in part.  Specifically, the Court denies the Motion with respect to Plaintiff's stop

---

[42] The Court declines to reach Defendant's alternative argument that Plaintiff did not
suffer a deprivation of life, liberty, or property as a result of Defendant's actions, particularly in
view of the fact that he fails to offer *a single case* in support of this perfunctory argument.  (*See*
Def's Mem. 23–24; Def's Reply 8–9.)  *See Roman*, 2023 WL 8719968, at *14 (explaining that
courts generally deem as waived "notably underdeveloped" arguments and collecting cases).

and search claim, but grants the Motion with respect to Plaintiff's false arrest and imprisonment, malicious prosecution, and fair trial claims.

The Court will hold a telephonic status conference on April 8, 2024, at 11:30 a.m.  The Clerk of Court is respectfully directed to terminate the pending Motion.  (*See* Dkt. No. 83.)

SO ORDERED.

Dated:   March 22, 2024
          White Plains, New York

_____
          KENNETH M. KARAS
          United States District Judge